IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
STATESVILLE DIVISION

UNITED STATES OF AMERICA,                    Charlotte, North
                                             Carolina

                                             No. 5:19-cr-022
          vs.

                                             9:00 a.m. - 10:48 a.m.

GREG E. LINDBERG and JOHN D. GRAY,     Volume 6 of 7

          Defendants.
_____



                    JURY TRIAL PROCEEDINGS
          BEFORE THE HONORABLE MAX O. COGBURN, JR.
                 UNITED STATES DISTRICT JUDGE













STENOGRAPHICALLY REPORTED BY:

                         REBECCA MAXCY, RMR, CRR
                         Federal Official Court Reporter
                         United States District Court
                         Charles R. Jonas Federal Building
                         401 W. Trade Street
                         Charlotte, North Carolina 28202
                         (704)350-7493

```
1    APPEARANCES:

2    FOR THE GOVERNMENT:          LAWRENCE J. CAMERON
                                  DANA O. WASHINGTON
3                                 U. S. Attorney's Office
                                  227 West Trade Street
4                                 Suite 1650
                                  Charlotte, NC 28202
5
                                  WILLIAM J. GULLOTTA
6                                 U.S. Department of Justice -
                                   Criminal Division - Public
7                                  Integrity Section
                                  1301 New York Avenue NW
8                                 Washington, D.C. 20004

9    FOR DEFENDANT LINDBERG:      BRANDON N. McCARTHY
                                  RACHEL M. RILEY
10                                Katten Muchin Rosenman LLP
                                  2121 N. Pearl Street
11                                Suite 1100
                                  Dallas, TX 75201
12
                                  ROBERT T. SMITH
13                                Katten Muchin Rosenman LLP
                                  1919 Pennsylvania Avenue NW
14                                Suite 800
                                  Washington, D.C. 20006
15
                                  JAMES F. WYATT
16                                Wyatt & Blake LLP
                                  402 West Trade Street
17                                Suite 101
                                  Charlotte, NC 28202
18
     FOR DEFENDANT GRAY:          SEAN P. DEVEREUX
19                                Devereux & Banzhoff PLLC
                                  22 South Pack Square
20                                Suite 1100
                                  Asheville, NC 28801
21
                                  STEPHEN L. CASH
22                                Searson Jones Gottschalk &
                                   Cash PLLC
23                                21 Battery Park, Suite 205
                                  Asheville, NC 28801
24

25
```

1     <u>INDEX OF EXAMINATION</u>

2     <u>DEFENDANTS' WITNESSES</u>                                    <u>PAGE</u>

3     <u>DEBRA WALKER</u>

4     Direct Examination by Mr. McCarthy            841
      Cross-Examination by Mr. Cash                 858
5     Cross-Examination by Mr. Cameron              859
      Redirect Examination by Mr. McCarthy          869

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                    <u>INDEX OF EXHIBITS</u>

2       <u>DEFENDANT LINDBERG</u>                    <u>RECEIVED</u>

3        55 .............................    849

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1    Tuesday, May 14, 2024

2              P R O C E E D I N G S

3         (Court called to order.)

4         (The proceedings reconvened at 9:00 a.m. with the

5    Court, counsel, and Defendants present.)

6         THE COURT:  Okay.  We can put more on the record -- is

7    the jury here?

8         COURTROOM DEPUTY:  Yes.

9         THE COURT:  They're not here?

10        COURTROOM DEPUTY:  They are here.

11        THE COURT:  They are here.  Okay.

12        COURTROOM DEPUTY:  Yes.

13        THE COURT:  We can put more on the record later on.

14   For instance, Mr. Devereux, with regard to the thing you were

15   worried about, it was one of the few things that the Fourth

16   Circuit said I got right in the opinion.  So I'm going to leave

17   it there.

18        MR. DEVEREUX:  Correct, Your Honor.  The only reason we

19   asked for it -- I don't want to belabor this -- is it was the

20   very precise language of McDonnell, and it was cited in this

21   case, in Lindberg, the Fourth Circuit decision.

22        THE COURT:  At the same time they were telling me that

23   the instruction I gave in that case was absolutely correct on

24   specific act.  So I don't want to -- they tell me I'm exactly

25   right, and I change it, so I don't want to do that.

1          MR. DEVEREUX:  I don't think you can go wrong by --

2     according to the Supreme Court, but that's all I've got to say,

3     Your Honor.

4          May I ask this, though.  May I argue that language in

5     closing, the complete language?

6          THE COURT:  Not that -- you can't quote the Supreme

7     Court.  No, you can't quote -- you can't start quoting the law

8     in the case.  You can't argue the McDonnell case, no.

9          MR. DEVEREUX:  Okay.

10          THE COURT:  No.

11          MR. SMITH:  I was going to just ask if he could use the

12     language without attributing it to the Supreme Court.  So as --

13          THE COURT:  Yeah, you can.  You can say -- you can use

14     the word that's going to be in the instruction and expand on it

15     as to what you say it means.

16          MR. DEVEREUX:  Okay.

17          THE COURT:  That you can do.  You can't just give it

18     the Supreme Court says.

19          MR. DEVEREUX:  And if I show the jury the instruction,

20     I'll show them exactly what the instruction is, of course, and

21     then expand on it.

22          THE COURT:  You can do that.  That you can do.

23          MR. DEVEREUX:  I wasn't planning on citing --

24          THE COURT:  That you can do.  Just so you're not

25     quoting the Supreme Court and saying it's the Supreme Court.

```
 1            MR. DEVEREUX:  No --

 2            THE COURT:  Yes, you can do that.  That you can do.

 3            MR. DEVEREUX:  Thank you, Your Honor.

 4            MR. SMITH:  Do you want to take up now -- I just had

 5    four brief comments on the instructions to put on the record.

 6    We can do it now --

 7            THE COURT:  Let's do it later.  Since the whole jury is

 8    here, let's just gather them in here.  Before we start, I need

 9    to know what your witnesses are and what they're coming in for

10    right now, what their evidence -- so I can see where we're

11    going with it.

12            MR. McCARTHY:  Your Honor, Debra Walker will be the

13    first witness that we'll call.

14            THE COURT:  Okay.

15            MR. McCARTHY:  And then from there we'll make a

16    decision.  We have Mr. Belo, Mr. Martinez.  Ms. Kohn had a

17    conflict, so we finally just released her because it was going

18    to be a really terrible inconvenience for her to make it.

19            THE COURT:  Okay.  And the reason I'm asking that is

20    because be careful about soliciting character evidence, because

21    if you do -- the way you do evidence, character evidence is you

22    find out how you know somebody.  And, of course, Debra Walker

23    worked with Greg Lindberg and company and did all those kind of

24    things, so she knows a lot.  But as soon as she says his

25    reputation for honesty is good, which that's where you can't
```

go.  Oh, it's wonderful.  He loves his mother and takes care of the poor and all that.  It's -- the word is good or excellent or whatever you're going to say, they can start asking what she knows about him, what she really knows about him, such as the trouble that's going on --

MR. McCARTHY:  I have none of that.

THE COURT:  -- with the affiliated cases.

MR. McCARTHY:  I have none of that.

THE COURT:  That's where you run in -- they get to go into the scope.  And I don't want to have to cut them off at some point going into too much in there.  Well, you know, he was indicted, but they can't -- if you start saying good stuff, they get to say some bad stuff.

MR. McCARTHY:  Certainly.  None of that.

THE COURT:  And I remember a case that I prosecuted where they brought all these people in for a child porn case.  That was back in the day where they sent stuff by mail.  That's how long I've been at this.  And all I had to do was go back and take copies of what he had ordered and show that to the witness.  Does that change your opinion?  The witness said, yes, it does, on the stand.

MR. McCARTHY:  I would agree with the witness.

THE COURT:  But I'd have been satisfied if he had said no to the jury.  I was happy -- either answer he gave I was happy.  I didn't care which way it went.

           1        Yes, sir.

           2        MR. SMITH:  Just one last thing, Your Honor, before the

     jury comes in.  We had filed a letter yesterday about formally

     tendering the two North Carolina state statutes.  Before you

     had allowed Mr. McCarthy to ask questions of Mr. Causey on it.

     We were formally going to ask the Court to admit those so they

     can be in front of the jury.  We have a letter on the point, so

     if you want to take it under advisement and have us argue it

     after --

          10        THE COURT:  Let's do that.  After we get the jury in

     here, we'll talk about that.

          12        MR. SMITH:  And that's at Document No. 434 for purposes

     of --

          14        THE COURT:  Also, I want to make sure that I get both

     copies, full copies, as full as they were -- they were already

     redacted some.  Full copies of the notes that were taken in

     there where the one --

          18        MR. CAMERON:  Yes.  Those were provided to the clerk.

          19        THE COURT:  -- partially on there and then the quote

     was gone.  I want both of those fully in, not just the parts

     that I let in so that the Fourth Circuit can see the things

     that I looked at and when I did the balancing what I left out,

     what I did not allow in and what I did allow in that I thought

     that the relevant -- was more probative than unfairly

     prejudicial.

1          MR. GULLOTTA:  Your Honor, the government provided

2     copies of those exhibits as they existed in our possession

3     prior to the redactions.  There are some redactions in those

4     documents --

5          THE COURT:  I know.  They're already there, yeah.

6          MR. GULLOTTA:  -- because that's the way we received

7     them.

8          THE COURT:  That's okay.  I'm not going to -- that's

9     what I -- I just want what I saw and what I ruled on, and I

10    want to put that in the record for the Fourth Circuit to take a

11    look at, so if there's an issue about any of that, they can see

12    how much was left out and what I felt was more probative than

13    unfairly prejudicial.

14         MR. GULLOTTA:  Indeed, Your Honor.  And the Court has

15    now the sort of before-and-after versions.

16         THE COURT:  Okay.  So I'll put those in the record at

17    the end of everything, not to go to the jury, but just for the

18    purposes of the Fourth Circuit.  Everybody may be just

19    satisfied, so we'll see.

20         COURTROOM DEPUTY:  Are you ready for the jury?

21         THE COURT:  Yeah.  Let's bring them on in.

22         MR. WASHINGTON:  Judge, the government hadn't formally

23    rested yet, so I will do that in front of the jury.

24         THE COURT:  That will be good.

25         MR. WYATT:  When would you like us to make our motion

1    relating to that?

2           THE COURT:  Well, let's just -- you make it -- tell her

3    to wait.  Let's just go ahead and do it now.  Wait.  Let's hold

4    on.  Hold on.  Go back up.  Sorry.  I'm sorry.  I did tell her

5    to bring you in, but now I've got something else I've got to

6    take care of.

7           Okay.  All right.  Go ahead.

8           MR. SMITH:  So at this time, on the knowledge that the

9    government is resting, we'd move for a judgment of acquittal,

10   Your Honor.

11          THE COURT:  Any specific arguments with regard to that?

12   Any particular points that they failed to -- specifically they

13   failed to do?

14          MR. SMITH:  Yes, Your Honor.  So on Count 1, official

15   act, it's our contention that a reassignment of task or an

16   internal movement are not like an administrative determination

17   hearing or the like, nor are they a decision on something to

18   that effect.  There is insufficient evidence of concealment,

19   which is an element of honest-services wire fraud.  The

20   donations were disclosed.  And then there's no specific intent

21   in this case on the evidence that was presented.  The

22   government put on no evidence establishing an awareness on the

23   defendants' part to that effect.

24          With respect to Count 2, similar arguments,

25   insufficient evidence on the business or transaction element.

1    Largely for the same reasons that there's insufficient evidence

2    on an official act, but the decision internal to the department

3    is different from the business of the insurance department,

4    which is external in regulating entities.

5            The $5,000 or more, Your Honor, there's insufficient

6    evidence there.  I understand that the Fourth Circuit has held

7    that you can look to the bribe in determining the value of the

8    subject matter of the bribe, but here I don't think it's

9    sufficient both because Mr. Causey and special agent admitted

10   that there was no evidence that Debbie Walker promised or

11   guaranteed anything of value.

12           And given that there are campaign contributions at

13   issue here, Your Honor, I think it is particularly

14   inappropriate to rely on the value of the bribe.  You could

15   imagine, for example, a lawful donation to someone, and if that

16   is used as evidence in a quid pro quo, it raises profound First

17   Amendment issues.

18           And then finally, again, insufficient evidence on the

19   corrupt intent.  Thank you, Your Honor.

20           THE COURT:  All right.

21           Yeah.  Go ahead.

22           MR. CASH:  Your Honor, John Gray would join in the

23   motion for acquittal and incorporate the arguments of counsel.

24   Thank you.

25           THE COURT:  Yeah.  I think there's plenty of evidence

1   on everything.  I think that the reassignment of some task may

2   not be, but some task may be.  It's going to be up to the jury

3   to decide what occurred here.  I don't think it's an absolute,

4   absolute there.

5        With regard to the campaign contributions being the

6   part of it, it's pretty clear that although the reward to

7   Mr. Causey for having called Michigan is not a violation of

8   law, certainly there's grooming, grooming someone for what

9   occurred later on.  You play with us, and we'll play with you.

10  The fact that it's -- campaign contributions aren't something

11  special.  It's not like it's some kind of valueless thing.

12  Mr. Lindberg is willing to put millions of dollars on this deal

13  of real money.  Now, that may not -- that amount of money may

14  not be a lot to him, but it's a lot to a lot of people.  And so

15  I think there's plenty there.

16       With regard to the specific intent, there's a lot of

17  evidence in there, and the jury can decide from all -- from

18  listening -- they've seen the tapes.  They've heard the

19  evidence as to what his intent was.  I think there is one of

20  the clearest pieces of intent that I have seen in a case like

21  this, and that is the quid pro quo being listed in those

22  documents and then following the FBI coming in, the quo

23  disappearing from there.  That's about as clear evidence as

24  could be, could be in a case that the person knew something was

25  wrong.  Whether the jury thinks that or not, I don't know, but

 1    it's certainly enough to go to the jury.

 2         So motions will be denied.

 3         MR. SMITH:  Thank you, Your Honor.

 4         THE COURT:  Okay.  Now we can bring the jury in.  I

 5    apologize to them for --

 6         (Jury in at 9:12 a.m.)

 7         THE COURT:  Okay.  Members of the jury, thank you for

 8    your patience and being here on time.  We always have things

 9    that go on.  Sometimes we have side bars.  Sometimes we do it

10    while you-all aren't in here, so we took care of it while you

11    weren't in here on this one.

12         All right.  Does the government have further evidence

13    at this time?

14         MR. WASHINGTON:  No, Your Honor.  At this time the

15    United States rests.

16         THE COURT:  All right.  Thank you.

17         Defense may proceed.

18         MR. McCARTHY:  Yes, Your Honor.  At this time the

19    defense calls Debra Walker.

20         COURTROOM DEPUTY:  Good morning.

21         THE WITNESS:  Good morning.

22         COURTROOM DEPUTY:  Please place your left hand on the

23    bible and raise your right.  Do you solemnly swear that the

24    testimony and evidence you're about to give in the matter now

25    before this Court shall be the truth, the whole truth, and

1  nothing but the truth, so help you God?

2          THE WITNESS:  I do.

3          COURTROOM DEPUTY:  Please be seated.

4          MR. McCARTHY:  Proceed, Your Honor?

5          THE COURT:  Yes, sir.

6                      DEBRA WALKER,

7  called as a witness, being first duly sworn, was examined and

8  testified as follows:

9                   DIRECT EXAMINATION

10 BY MR. McCARTHY:

11 Q.  Ms. Walker, could you please introduce yourself to the jury

12 over there to your left.

13 A.  Yes.  I'm Debra Moore Walker, formerly of the North

14 Carolina Department of Insurance.  I'm now retired for the last

15 two years.

16 Q.  And I'll get into the Department of Insurance, but how long

17 were you at the Department of Insurance before you retired?

18 A.  Approximately 30 years.

19 Q.  Okay.  And I'll back up a little bit before that.  Just

20 kind of education, background, just so the jury gets a sense of

21 basically your capabilities and education.  If you could start

22 in college.  Where did you go to college?

23 A.  I went to Meredith College in Raleigh, North Carolina, and

24 obtained a bachelor of business management there.  And then a

25 few years later I went to North Carolina State University to

1    obtain my final accounting coursework that I needed for my CPA,

2    which I attained in I believe that was 1992.  I started --

3    Q.  NC State?

4    A.  Yes, NC State.

5    Q.  You guys had a good year this year in basketball.

6    A.  Yes.  Surprisingly, yes.

7    Q.  So after NC State, what did you do after that?

8    A.  During the time where I was at NC State, I was working for

9    a life insurance company, Durham Life Insurance Company.  I

10   started there in 1984 and worked there until 1991, where I was

11   a -- started off as a general accountant and later moved into a

12   senior accountant role.  We prepared the financial statements

13   and the information for regulatory filings that actually went

14   to the North Carolina Department of Insurance.

15   Q.  So were you actually regulated by the Department of

16   Insurance?

17   A.  Yes.

18   Q.  Okay.  So you've been on both sides of the equation, so to

19   speak, in the private sector for, I think you said, seven

20   years; is that right?

21   A.  Yes.

22   Q.  Doing my math.  And then obviously DOI for a lot longer?

23   A.  Yes.

24   Q.  After seven years in the private sector, what did you do

25   next?

1    A.   Our company, unfortunately, was being sold.  So I

2    transferred into the North Carolina Department of Insurance as

3    a financial analyst, which was exciting because I was able now

4    to start understanding what the regulators did with all that

5    information that I was preparing at the insurance company.  So

6    I went into a role as a financial analyst and was in that role

7    for a few years.  And then I believe it was 1995 I took over a

8    section of the Department called the domestic company unit.

9    Q.   Okay.  And so you went -- let's see.  Financial examiner to

10   what was the next step?

11   A.   Senior analyst.

12   Q.   Analyst.  Okay.  And how long did you do that?

13   A.   I did that until 1998, so for three years.  Actually --

14   Q.   Generally, what does that position do?

15   A.   That position was responsible for the regulation of all

16   North Carolina companies.  So all companies that were

17   domiciled, incorporated in North Carolina, my unit was

18   responsible for the regulation of that.  That means the

19   financial solvency and compliance to make sure they could pay

20   their claims, basically.

21   Q.   Okay.  So after you did that, take me to the next step.

22   A.   Okay.  In 1998 I left briefly and went to the North

23   Carolina League of Municipalities, and there I was the general

24   accounting manager.  Stayed there for a little over a year, but

25   I really missed the work at the Department, and I was able to

1  return to the Department as assistant chief financial analyst.

2  And in that I was doing more of the same, but at a higher

3  level, overseeing the regulation of more insurance companies

4  that were licensed in North Carolina.

5  Q.  Sorry.  So that's a broad -- broader spectrum position.

6  Would that be fair to say?

7  A.  Yes.  Yes.

8  Q.  How long have you been at DOI?  I know you took a break

9  there, but how long have you been at DOI at this point?  I'm

10  making you do the math.

11  A.  Can't do that math.  At least 15 years.

12  Q.  Okay.  And, also, you're a CPA as well; right?

13  A.  Yes.

14  Q.  Okay.  Now, are you still a CPA or did you retire --

15  A.  I am.  I'm still a licensed CPA.

16  Q.  So we're at year 15.  Kind of take us from there.

17  A.  Okay.  So I was assistant chief financial analyst and did

18  that for a few years.  And then I believe it was 2006 I became

19  the chief financial analyst.  So that position was responsible

20  for the oversight of all licensed companies in the state, as

21  well as a few other regulated entity types, reinsurers and some

22  other entities.  So I managed a team -- we had about 20

23  analysts on the team, and we regulated all the insurance

24  companies for the state.

25  Q.  So is it fair -- did you, I guess, develop -- I don't know

1    if expertise is the right word, but a vast background in

2    overseeing companies, insurance companies, like Mr. Lindberg's

3    or any other insurance companies --

4    A.   Yes.

5    Q.   -- of North Carolina?

6    A.   Because we regulated all insurance companies, so whether

7    it's property or life or health or title, we were responsible

8    for all, so we had to have some general knowledge of all

9    insurance companies.

10   Q.   I know you were there pretty much forever, but you've done

11   all of that at this point?

12   A.   Yes.

13   Q.   And take us from there.  What year are we in?

14   A.   Okay.  We're -- I'm in 2006.  I did that work until 2013.

15   Q.   Okay.

16   A.   In 2013 North Carolina passed a new law that allowed for

17   the formation of a new type of insurance company called captive

18   insurance companies.  And I was fortunate to be given the

19   opportunity to move over to form -- help form a new section

20   that would regulate these new entity types.

21   Q.   And that was in 2013?

22   A.   2013.

23   Q.   Okay.  And take us from there.

24   A.   And we started with a team of three.  And as the number of

25   captive insurance companies grew, we added to our team.  When I

1  retired we had approximately 13 or 14 people on our team, and

2  we had about a thousand companies under -- or a thousand

3  regulated entities under our regulation in that division.

4  Q.  And just to give us an idea, approximately how many

5  employees are at the Department of Insurance?

6  A.  400.

7  Q.  Okay.  And then how many of these deputies are there

8  overseeing regulation?

9  A.  There's a number of deputies.  Each -- typically each

10  division of the Department has a deputy commissioner over it.

11  I was a deputy commissioner and then eventually became senior

12  deputy under Commissioner Causey.  But we'll have an agent

13  services division and then a consumer services division,

14  property and casualty division, life and health division.  And

15  there's some others.  There's probably two to three more.

16  Q.  Fair to say there's a lot of deputies?

17  A.  There's a lot of deputies, yes.

18  Q.  Okay.  And then one of the deputies I think you've worked

19  with for a long time is Jackie Obusek?

20  A.  Yes.

21  Q.  In fact, were you Jackie Obusek's, I think in the

22  hierarchy, her boss?

23  A.  Yes.  Hired Jackie I believe it was 1997.

24  Q.  You hired her?

25  A.  Yes.

```
 1   Q.   Okay.
 2   A.   And she came in to work on HMOs.  That's when HMOs were a
 3   new thing.  And she pretty much followed my career path.  As I
 4   moved, she moved.
 5   Q.   Okay.  And how long were you her boss or direct superior?
 6   A.   About 14, 15 years.
 7   Q.   And outside of you-all being work colleagues, you guys are
 8   also friends; right?
 9   A.   Yes, we are.
10   Q.   Go to lunch together and that kind of thing?
11   A.   Yes.
12   Q.   And then how long have you worked for Mr. Causey?
13   A.   I worked for him starting January of 2017 until I retired
14   April 1st, 2022.
15   Q.   Generally have a good relationship with him?
16   A.   Yes.
17   Q.   And then during the -- and I don't mean to embarrass you,
18   but during the course of your career there, you have received
19   several awards.  Is that fair to say?
20   A.   Yes.
21   Q.   And one of them I saw was the -- let me show you GEL No. 6.
22        MR. McCARTHY:  It's already been admitted, Your Honor.
23   Q.   Ms. Walker, is that you?
24   A.   Yes.
25   Q.   Okay.  What is that one?  What is that award?
```

1    A.   This was upon my retirement.  I was given the Order of the

2    Lone Leaf Pine.  This is an award that's issued by the governor

3    for many reasons.  My reason, I believe, was longevity, and

4    they mentioned outstanding dedication to service and going

5    above and beyond.

6    Q.   Above and beyond.  Okay.  Yeah.  We can take that down.

7    And then you also -- you won One -- is it called One to Watch?

8    Am I right on that?

9    A.   Yes.  That was in 2014.  There was a publication in the

10   captive industry called Captive Review.  And every year they

11   have what they call a Power 50, and they also have a list of

12   those persons coming up in the industry, Ones to Watch.  And in

13   2014 I was One to Watch.

14   Q.   And that was my next question.  So you won a Power 50

15   award.  Is that also an award?

16   A.   Power 50 is another award.  I received that in 2018.

17   Q.   And then if I could show you GEL-55.  It's not yet been

18   admitted.  You also won -- I think it was a national award, in

19   a magazine.  It was in a magazine; correct?

20   A.   Yes.

21   Q.   Okay.  And is this it?

22   A.   I believe the national award you're referring to was the

23   Captive Review, Power 50.  This was, though, a special article

24   about North Carolina and our achievement in the captive

25   industry.

1   Q.   Okay.  And that's obviously you in the picture?

2   A.   Yes.

3   Q.   That's about you; correct?

4   A.   Yes.

5        MR. McCARTHY:  We would formally offer GEL-55 at this

6   time.

7        MR. CAMERON:  I'm going to object to relevance, Your

8   Honor.

9        THE COURT:  Sustained.  They're aware of it.

10  Q.   Let's talk about the -- you said the number of companies

11  like generally --

12       MR. McCARTHY:  Can I stand, Your Honor?

13       THE COURT:  Huh?

14       MR. McCARTHY:  Could I stand, Your Honor?

15       THE COURT:  You can.  What are we going to do?

16       MR. McCARTHY:  Just write numbers down.

17       THE COURT:  Okay.

18  Q.   Just so we get an idea, for DOI, the Department of

19  Insurance, so how many companies -- and just ballpark, of

20  course.  How many companies does DOI regulate with all the

21  deputies?

22  A.   I don't know that number.  I can tell you on the

23  traditional side, which is non-captive, I would estimate 1200

24  plus.

25  Q.   Okay.

1  A.  And the captive side, a thousand plus.

2  Q.  Okay.  And so, for example, just to make it more specific,

3  approximately how many -- at this time period how many

4  companies did Ms. Obusek regulate?

5  A.  She would be on the traditional side, so 1200 plus.

6  Q.  She's basically got 1200 files, I guess, for lack of a

7  better word.  And then at that time how many did you have?

8       MR. CAMERON:  Objection to classification of files.

9       THE COURT:  She's overseeing companies -- overruled.  I

10 think the jury understands.

11 Q.  You can answer.

12 A.  Which time period?

13 Q.  Like the 2018, around there, ballpark.

14 A.  Around 600 at that time.

15 Q.  600.  Okay.  A lot; correct?

16 A.  Yes.

17 Q.  You had a lot; she had a lot.  All right.  I guess the

18 daily responsibilities -- kind of, you know, describe in

19 general what overseeing a company is like.  What do you do?

20 A.  Well, each analyst in my division had assigned companies

21 that they were responsible for, and those responsibilities

22 would include obtaining financial statements and reviewing

23 those financial statements to ensure the companies were in

24 compliance with the laws and had sufficient surplus to meet its

25 obligations.  Also, there's special filings that department

1   reviews for transactions that these companies may want to

2   participate in.  They may want to pay dividends.  They may want

3   to enter into agreements.  They may want to obtain a loan.

4   Whatever that is, there's certain things that require the

5   Department's approval before they can do that.

6   Q.   Okay.

7   A.   And those come in just periodically, you know, just random.

8   We don't know when those are coming in.  But the analyst that's

9   responsible for that company will review those filings as well.

10  And then there's supervisory review of that information.

11  Q.   So at this time period, the 2018, are you regulating

12  companies for Mr. Lindberg at the same time as Ms. Obusek is

13  regulating companies for Mr. Lindberg?

14  A.   Yes.

15  Q.   And as far as that goes, was there even -- was it

16  Southland -- was there a joint effort with your group and

17  Ms. Obusek's group on one of Mr. Lindberg's companies during

18  this period?

19  A.   There was -- the very first captive in that group was

20  formed early on when the captive program was getting

21  established, and we were reviewing the application of that

22  captive in conjunction with Ms. Obusek's area.  And the reason

23  is each of our divisions were responsible for approving certain

24  parts of that transaction.  And so we did coordinate because we

25  didn't want to send out letters asking the same questions, so

 1  we coordinated together and tried to send that information as

 2  succinctly and as efficiently as we could.

 3  Q.  So, I guess, fair to say you were already familiar with

 4  GBIG, I guess is what I'm asking?

 5  A.  I knew of the group, but that group redomiciled to North

 6  Carolina after I moved to the captive division, so I was never

 7  responsible for the regulation of that company.

 8  Q.  And with respect to Mr. Lindberg's companies that you were

 9  overseeing or regulating at that time, did you promise any type

10  of special treatment at any time to Mr. Lindberg or to anybody

11  at GBIG with respect to those companies?

12  A.  No.

13  Q.  Were you surprised in this case that you were asked for

14  instead of Jackie?

15  A.  Yes.

16  Q.  Okay.  And historically -- I'm just asking -- do you and

17  Mrs. Obusek usually land at the same place or come to the same

18  conclusions with regard to regulation?

19  A.  Yes.  I mean, we've worked together for so long.  We have

20  our own ways of coming to our conclusions, but we, I would say,

21  99 percent of the time came to the same conclusion when we were

22  working together on what the next regulatory action should be

23  for a company.

24  Q.  And were you ever, at least in your opinion, any like less

25  tough on Mr. Lindberg's companies when you were regulating them

1    at all?

2    A.  No.

3    Q.  Let me ask you about financial benefits of using you versus

4    Jackie.  Are you-all salaried employees?

5    A.  Yes.

6    Q.  There's no like bonuses or anything?

7    A.  No.

8    Q.  So is it -- is there any guaranteed benefit financially --

9            MR. CAMERON:  Objection.  Guaranteed benefit.

10           THE COURT:  You're talking about in the -- you're

11   talking about in the business about any benefit?

12           MR. McCARTHY:  Yes, Your Honor.

13           THE COURT:  Offered by the State?

14           MR. McCARTHY:  Correct.

15           THE COURT:  Yeah.

16           MR. CAMERON:  I'll withdraw it.

17           THE COURT:  By the State.  Yeah.  Go ahead.

18   Q.  Is there any financial benefit to using Debbie over Jackie?

19   Like is it 5,000 bucks cheaper or more to use you versus her?

20   A.  No.

21   Q.  Okay.  Is it the exact same?

22   A.  The companies typically do not pay for regulatory services.

23   That's -- our salaries are paid by the State and the taxpayers

24   of North Carolina.  There's a few responsibilities that the

25   Department has that are paid for by a company; sometimes

1  financial examinations, on-site examinations when we use

2  consultants, but what you're talking about, no.

3  Q.  Okay.  That's what I'm saying.  You do regulatory

4  responsibilities because your salary is the same price, so to

5  speak, as Jackie Obusek?

6  A.  Right.  It's zero.  Zero to the company.

7  Q.  And did you ever intend to give any financial benefit at

8  all to Mr. Lindberg or to his GBIG companies?

9  A.  No.

10 Q.  And with respect to taking over the responsibilities, the

11 files, however it's phrased, but are there instances when you

12 had to take over the files, that is the regulatory

13 responsibilities, of a colleague?

14 A.  Yes.

15 Q.  And --

16 A.  In both the captive division and the financial analysis

17 section, both of those sections in which I was responsible for

18 at different times.

19 Q.  And did that happen fairly routinely within the Department

20 of Insurance?

21 A.  Yes.  As employees would come and go or be out, absences or

22 vacations or as workload demands change, we would have to -- we

23 allocate companies from one to another.

24 Q.  Okay.  It's like -- a bunch of people got fired or

25 something, their files have to disseminate down through the

1  group?

2  A.  Right.

3  Q.  Maternity leave, somebody gets sick, quits their job,

4  whatever?

5  A.  Right.

6  Q.  I mean, that happens fairly routinely within the DOI?

7  A.  Yes.

8  Q.  And would you describe -- is it fair to say that that's a

9  nonevent?

10 A.  Nonevent as far as the reallocation?

11 Q.  Right.  I mean, for example -- I mean, when you're given

12 other files of a colleague -- or I'm sorry, regulatory

13 responsibilities, your title doesn't change; correct?

14 A.  Correct.

15 Q.  Your office doesn't change.  You stay in the same place?

16 A.  Yes.

17 Q.  Okay.  You don't -- you didn't get -- you don't get demoted

18 or promoted because you got some files of a colleague?

19 A.  That's correct.

20 Q.  Can it happen with a conversation with you and the other

21 regulator or an e-mail?  I guess they're electronic.

22 A.  It could be any of those things.  I would always do that

23 verbally and communicate to the analysts what was changing with

24 their assignments and explain why that was happening and also

25 share with them what was happening with those new companies so

1    that they could pick up and go forward.

2    Q.   And I'm a paper guy, but everything is electronic now;

3    right?

4    A.   Right.

5    Q.   Okay.  So when you send the files from one regulator to

6    another, is it just you're forwarding the e-mail with the

7    attachments?

8    A.   The files are in a location where every analyst in the

9    division can access them at any time.  So it's just a matter of

10   telling that person you're now responsible for this company.

11   They know where to go to find the files.

12   Q.   Okay.  Let me show you a short clip, clip 197.3.

13            (Recording played for the jury.)

14   Q.   And that's Mr. Causey.  You recognize his voice; correct?

15   A.   I do.

16   Q.   Okay.  And you do agree with him -- it's not even that

17   hard.  You just have to have a conversation, just like you

18   said?

19            (Interruption by court reporter.)

20   Q.   He talked about a conversation, just like you just said to

21   the jury; correct?

22   A.   Yes.  The transfer is just that.

23   Q.   And I apologize for these questions because I know they're

24   a little bit dumb, but it doesn't require any type of hearing,

25   does it, for that to happen?

1  A.  No.

2  Q.  Doesn't require like a full-blown lawsuit or anything to be

3  filed?

4  A.  No.

5  Q.  Does it require even a signature from the commissioner?

6  A.  No.

7  Q.  I mean, does the commissioner even know most of the time

8  when you-all transfer files between regulators?

9  A.  Most of the time not.  It's usually handled by the division

10  head with their team or if it's moving to a different division,

11  it's handled by those two division heads.  They work out how

12  that's going to take place.

13  Q.  And, to your knowledge, does it require any formal or

14  official action by the commissioner himself?

15  A.  No.

16  Q.  And, finally, Ms. Walker, just to clear up any doubt, did

17  you ever have any type of side deal with Mr. Lindberg or the

18  GBIG folks at all?

19  A.  I did not.

20  Q.  Did Mr. Lindberg, my client, or anybody at GBIG ask you to

21  do anything inappropriate at any time?

22  A.  No.

23  Q.  Did they ever offer you any money or anything of value at

24  all?

25  A.  No.

1   Q.   Have you ever even spoken to Mr. Lindberg in your life, to

2   your knowledge?

3   A.   I was reminded there was a meeting, I think, in 2012 or

4   2013 where Mr. Lindberg came in with some others to talk about

5   a redomestication of the GBIG companies to North Carolina.  And

6   at that time I was the chief financial analyst and, therefore,

7   would be in on that meeting.  I don't really recall this

8   meeting.  But we had a lot of those meetings where people came

9   in to say they were going to file an application for a license

10  or move their companies.  And so we had those meetings and then

11  often nothing ever happened.  But I understand I was in that

12  meeting, but, again, when those companies did move, I had

13  already transferred to a different division, so I was not

14  involved with that.

15  Q.   So other than 2012 -- obviously we're talking about 2018

16  here -- any conversation ever with Mr. Lindberg?

17  A.   Not that I recall at all.

18          MR. McCARTHY:  Pass the witness, Your Honor.

19                  CROSS-EXAMINATION

20  BY MR. CASH:

21  Q.   Good morning, Ms. Walker.  Over here.

22  A.   Good morning.

23  Q.   I represent John Gray.  He's sitting beside me.  Do you

24  know John?

25  A.   I believe I met Mr. Gray one time at the Department.  He

1  was at the Department for a meeting that included our chief

2  deputy, Michelle Osborne.  And she buzzed me in my office and

3  asked me to come up and just share with him and the others that

4  were in that group about captive insurance and what that is.

5  And I believe that's the only time I had any interaction with

6  Mr. Gray.

7  Q.  No other phone conversations or anything like that?

8  A.  I don't recall anything else.

9       MR. CASH:  Those are my only questions.  Thank you.

10       THE COURT:  Cross.

11       MR. CAMERON:  Yes, Your Honor.  Thank you.

12                    CROSS-EXAMINATION

13  BY MR. CAMERON:

14  Q.  Good morning.

15  A.  Good morning.

16  Q.  First, just to get us oriented, I'd like to show you what's

17  already been admitted as Government's Exhibit 97.  It's an

18  organizational chart of the North Carolina Department of

19  Insurance as of 2018.

20  A.  Okay.

21  Q.  So just take a moment just to look at that on your screen,

22  if you would, and just let me know if you think it's accurate.

23  So at the top it's got the commissioner, Mike Causey.  Right

24  below it it's got the chief deputy, Michelle Osborne; correct?

25  A.  Correct.

1   Q.   And then on the next line you've got six individuals, all

2   reporting in to the chief deputy; correct?

3   A.   That's correct.

4   Q.   And those are the six individuals who were responsible for

5   different sections or groups, whatever you want to call them,

6   within the Department; is that right?

7   A.   That's correct.

8   Q.   And so these are all sort of high-ranking individuals

9   within the Department; is that right?

10  A.   That's right.

11  Q.   And you're on that line; is that right?

12  A.   Yes.

13  Q.   And Ms. Obusek is on that line?

14  A.   Yes, she is.

15  Q.   All right.  And so is it fair to say that the folks on

16  this line are kind of responsible for the programs under which

17  they -- for which they are responsible?

18  A.   That's right.

19  Q.   Okay.  So you were head of the group that handled captive

20  insurance companies; right?

21  A.   Right.

22  Q.   So that means you're responsible for the oversight of the

23  North Carolina Department of Insurance's regulation of captive

24  insurance companies; correct?

25  A.   Correct.

1   Q.   The whole thing?

2   A.   Yes.

3   Q.   All right.  And Ms. Obusek is responsible for the company

4   services group; is that right?

5   A.   That's right.

6   Q.   And that, similarly, means that she's responsible for

7   overseeing all regulation of insurance companies that are

8   impacted by the company services group; correct?

9   A.   That's correct.

10  Q.   She's responsible for the program?

11  A.   Yes.

12  Q.   Okay.  And let's go down to page 3 of this exhibit.  And so

13  within the company services group there were different units or

14  divisions; is that right?

15  A.   That's right.

16  Q.   What do we call them?  Like financial evaluation.  Was that

17  a group?  A division?  A section?  What do you call it?

18  A.   Some -- each one is slightly different.  Like actuarial

19  services is a division.

20  Q.   Okay.

21  A.   Financial evaluation -- no.  I take that back.  I'm sorry.

22  Yes, divisions.

23  Q.   Okay.  So, again, similar to what I asked you before about

24  the company services group, Ms. Obusek is, therefore,

25  responsible for the oversight of all the work that's being done

 1  by these subdivisions; correct?

 2  A.  That's correct.

 3  Q.  So financial evaluation; right?

 4  A.  Yes.

 5  Q.  That's the group that does the periodic examinations; is

 6  that right?

 7  A.  Yes.

 8  Q.  Okay.  And those are the things that are sort of almost

 9  more like an audit that occurs by statute every five years, but

10  can occur more frequently, if necessary?

11  A.  Yes.

12  Q.  Okay.  So based on her role as the senior deputy over the

13  company services group, Ms. Obusek was responsible for all

14  financial evaluation being done by the Department of Insurance;

15  correct?

16  A.  Correct.

17  Q.  And not just like the individual examinations themselves,

18  but more broadly speaking, the way evaluations are done, the

19  examinations are done?

20  A.  Yes.

21  Q.  Okay.  And financial analysis and receivership group,

22  that's the company -- that's the group that does the ongoing

23  quarterly, annual financial analysis of insurance companies;

24  right?

25  A.  That's right.

 1    Q.   And that means, then, as the senior deputy Ms. Obusek was

 2    responsible for all financial analysis of all insurance

 3    companies in the state of North Carolina; is that correct?

 4    A.   Right.  Except for the captives.

 5    Q.   Except for the captives.  Okay.

 6    A.   Everything that was financial --

 7    Q.   Right.

 8    A.   -- in these divisions.

 9    Q.   Right.  Traditional insurance companies.

10    A.   Yes.

11    Q.   The 1200 or so --

12    A.   Yes.

13    Q.   -- that's her responsibility?

14    A.   That's right.

15    Q.   Unless the commissioner decides otherwise; right?

16    A.   That's right.

17    Q.   And so, again, not just the individual statements

18    themselves as they're coming in and the letters that are being

19    generated by the Department in response, but again, more

20    broadly, the Department's approach to financial analysis for

21    traditional insurance companies, she was responsible for

22    overseeing that; right?

23    A.   That's right.

24    Q.   And there's a reason why the Department is organized in

25    this fashion; right?

1   A.   Yes.

2   Q.   I mean, it's to ensure consistency amongst insurance

3   companies that, you know, the Department has an approach to

4   financial analysis and that approach is being applied across

5   all insurance companies that are within that -- that are

6   regulated by that section; right?

7   A.   Right.

8   Q.   Okay.  And so you talked a little bit on direct examination

9   about if somebody goes on maternity leave, files getting passed

10  away; is that right?

11  A.   Yes.

12  Q.   Is it fair to say that that's something that is more

13  applicable to the frontline sort of analysts and senior

14  analysts that are doing the majority of the actual work?

15  A.   Yes.

16  Q.   Okay.  Have you seen senior deputies -- like, for example,

17  if Ms. Obusek had to go out on sick leave or something like

18  that, would it then -- going back to page 1, would her work be

19  passed to another senior deputy overseeing another entirely

20  separate group or division?

21  A.   I don't know that that's ever happened.

22  Q.   Okay.

23  A.   It could or it could be someone under her --

24  Q.   Right.

25  A.   -- in her organization.

1  Q.  Would it be more likely that it would be sort of a deputy,

2  not a senior deputy, but a deputy?

3          MR. DEVEREUX:  Objection.  Leading.

4          THE COURT:  Go ahead.

5          Hold on a second.  You object?

6          MR. DEVEREUX:  I do, Your Honor.

7          THE COURT:  What's the objection?

8          MR. DEVEREUX:  Leading.

9          MR. CAMERON:  Cross-examination, Your Honor.

10          THE COURT:  Cross-examination, so overruled.

11          And members of the jury, if it's your witness, you're

12  not supposed to lead.  There always is a little bit of leading

13  on direct.  You're not supposed to.  On cross-examination you

14  can lead all day.  You saw that with their examination of the

15  government's witnesses, and now they can do that.  Now the

16  government can do that.

17          So go ahead.

18  Q.  So I think I asked you wouldn't it be more likely that if

19  something happened to a senior deputy, one of their deputies

20  that's directly beneath them would sort of take over that role;

21  correct?

22  A.  It could be.

23  Q.  Okay.  And so in terms of all this file passing and things

24  of that nature that was talked about with Mr. McCarthy, that is

25  more applicable to, again, frontline analysts, maybe senior

1   analysts or examiners, people at that level; correct?

2   A.   Right.

3   Q.   Okay.  Within the same division or the same group; correct?

4   A.   Typically.

5   Q.   Typically.  Or at least a related group; correct?

6   A.   Correct.

7   Q.   I mean, when you were overseeing captives, did any of your

8   analysts or examiners, were they ever asked to oversee the

9   regulation of a traditional insurance company?

10  A.   That didn't -- that did not happen.

11  Q.   Because the work being done by the captive insurance group

12  is very different than the work being done by the analysts and

13  examiners who are overseeing traditional insurance companies;

14  correct?

15  A.   Correct.

16  Q.   And as head of captive insurance division yourself, were

17  you ever asked to assist in overseeing any traditional

18  insurance companies?

19  A.   No.

20  Q.   And in talking about these assignments, the commissioner is

21  the -- or the deputy commissioner are the individuals who

22  decide, you know, who to put in these different positions; is

23  that right?

24  A.   Will you say that again.

25  Q.   The commissioner of insurance or his deputy are the people

1   who decide who does what work within the Department; correct?

2   A.   That -- who appoints these division heads?

3   Q.   Yes.  Who holds these positions on the screen --

4   A.   Yes.  That's correct.

5   Q.   -- or even below them, who, you know, handles what cases

6   and what files; is that correct?

7   A.   Typically the deputy commissioners or their managers that

8   report to them are the ones that are making those decisions on

9   the staff and what staff is going to do what.

10  Q.   Okay.  My apologies.  I didn't ask that question very

11  clearly.  So what I should have asked is the commissioner and

12  the deputy are the ones who decide who holds these senior

13  roles; is that correct?

14  A.   That's correct.

15  Q.   And then from beneath that, they decide who either is the

16  deputy or the chief analyst or so on and so forth; correct?

17  A.   Correct.

18  Q.   Have you ever seen an insurance company decide who

19  regulates them in your history in the Department?

20  A.   I don't -- no.

21  Q.   Okay.  And that's something -- I mean, you would remember

22  that if you saw it; right?

23  A.   Right.  There was a change made one time, but I don't think

24  the company made that decision.

25  Q.   Okay.  And you're very familiar with Jackie Obusek;

1    correct?

2    A.   Correct.

3    Q.   Good friends?

4    A.   Yes.

5    Q.   And you're retired now; right?

6    A.   I am.

7    Q.   But you still have lunch with her once a week?

8    A.   Yes.

9    Q.   Fair to say that she is a fair regulator?

10   A.   Yes.

11   Q.   Have you ever seen her take any action against an insurance

12   company based on any sort of personal bias or vendetta --

13   A.   No.

14   Q.   -- or animus or anything of that nature?

15   A.   No.

16   Q.   You were in the Department when she was promoted to the

17   senior deputy; correct?

18   A.   Yes.

19   Q.   She was imminently qualified for that position, wasn't she?

20   A.   Yes.

21   Q.   And since that time, she has been promoted to the No. 2

22   position, chief deputy; right?

23   A.   That's right.

24   Q.   And you were in the Department when that happened or had

25   you already left?

1    A.   No.  I had left.

2    Q.   But you were familiar with it?

3    A.   Yes.

4    Q.   And you're familiar with other folks within the Department

5    that could have been considered for the position?

6    A.   Yes.

7    Q.   And she was imminently qualified for that position, wasn't

8    she?

9    A.   Yes.

10          MR. CAMERON:  No further questions, Your Honor.

11          THE COURT:  Okay.  Is there any redirect?

12          MR. McCARTHY:  Just one question, Judge.

13                    REDIRECT EXAMINATION

14   BY MR. McCARTHY:

15   Q.   Fair to say you have extensive experience in captive and

16   you have extensive experience in traditional?

17   A.   Yes.

18          MR. McCARTHY:  No further questions.

19          MR. CASH:  Nothing further, Your Honor.

20          THE COURT:  Thank you, ma'am.

21          THE WITNESS:  Thank you.

22          MR. WYATT:  Your Honor, we may need a side bar on the

23   document.

24          THE COURT:  On the document.  Okay.  Let's do that.

25          Members of the jury, excuse us for just a moment.

```
1              (At side bar on the record.)

2         THE COURT:  All right.

3         MR. WYATT:  He leads everyone on direct, so it was just

4    appropriate.

5         THE COURT:  That's true.  That's true.  Okay.

6         MR. SMITH:  So, Your Honor, we had tendered for your

7    consideration the admission of two NC State statutes, and we'd

8    formally move for their admission in front of the Court.

9         MR. McCARTHY:  They're GEL-33 and 34.

10        MR. SMITH:  In front of the jury.  Sorry.

11        THE COURT:  What's the relevance?

12        MR. SMITH:  So the relevance is it makes it more likely

13   in this case that either the transfer or reassignment of work

14   is not an official act because nobody thought that it was

15   relevant to comply with any of these statutes in terms of

16   having an order signed by the commissioner to effectuate them.

17        THE COURT:  What are these statutes on?

18        MR. SMITH:  So one of them, for example, says that when

19   the NC Department of Insurance regulates an entity, such as an

20   insurer, insurance agent, insurance broker, it issues an order

21   that is signed by the commissioner as part of the regulation

22   affecting them.

23        MR. McCARTHY:  And, Judge, part of it is the GEL-34 is

24   the one that Mike Causey testified to about the hearing and the

25   witnesses and the subpoenas and all that.  That's the document
```

1    that I asked him about, and you reserved your ruling.

2          THE COURT:  Yeah.  I think that was -- I don't even

3    remember who was questioning him about it right this minute,

4    but --

5          MR. GULLOTTA:  So, Your Honor, this is one -- actually,

6    two statutes in a series of 64 articles in the insurance code.

7    They've cherry-picked one that refers to a written order and

8    one that refers to a hearing.  There's nothing in the statute

9    that says the kind of action that the commissioner was asked to

10   take in this case requires an order.  So what this does is it

11   misleads the jury into thinking an official act requires a

12   writing or a hearing when the Supreme Court has defined what an

13   official act is and Your Honor's instructions describe what an

14   official act is.  And that's what they should be educated on.

15         These are two irrelevant statutes that have nothing to

16   do with the request made of the commissioner in this case.  All

17   they do is confuse the issues and make the jury think that for

18   some reason, because when orders are issued the order has to be

19   in writing, that somehow the action requested in this case

20   needs to be in writing.  And there's no evidence to support

21   that.

22         MR. McCARTHY:  And, Judge, this is more of a spectrum

23   argument of lunch versus full-blown hearing, whatever, and

24   where does this fall.  And that's what the purpose of it was.

25         MR. GULLOTTA:  The thing is if we would respond to

that, we would have to go in and pluck out all the different
statutes in that code, in that section that don't require a
writing.  And now we're handing the jury a book of the
insurance code articles and telling them which things require
written orders and which don't when in reality the Supreme
Court has described and defined what an official act is and so
do Your Honor's instructions.  This would totally confuse the
issues.  And the statutes are not relevant to the conduct in
the case.

MR. WYATT:  If you want all 62 statutes in, we're happy
to put all 62 in.

MR. GULLOTTA:  We're not advocating for that because it
would be extremely confusing.

MR. SMITH:  I would briefly note, Your Honor, that in
paragraph 2 of the indictment the U.S. Government puts before
the jury statutes that are supposedly relevant to the
commissioner's duties, state statutes.  And I think it's
equally relevant for the defense to be able to put forth state
statutes defining what those terms and duties are so that the
jury can decide for themselves.

If there's any issue of confusion in this case, you can
make clear that your instruction on federal law is what they're
governed by, but I think it certainly makes it more likely than
not -- and we cite case authority in our letters and
honest-services prosecutions of situations where state statutes

1    have come in on issues of fact.

2         MR. GULLOTTA:  So in the letter it refers to statutes

3    that are relevant to the conduct in those particular cases.  I

4    haven't read the cases.  We just got the letter last night.

5    But it's misleading to suggest that the statute that they're

6    offering clarifies any terms or words or things that are in the

7    statute that is referenced in the indictment.  Now, we could

8    redact that statute, but that statute has to do with the

9    assignment of regulators within the Department.  It's relevant

10   to the case.  That's why it's referenced in the statute.

11        The two that the defense is proposing have nothing to

12   do with this case, and they do not define any of the terms in

13   that statute that's referenced in the indictment.  They're

14   irrelevant.  It's just because they're about writings and

15   hearings, and they want to show the jury that sometimes some

16   things require a writing and sometimes some things require a

17   hearing.  But those things have nothing to do with the facts of

18   this case, and it would confuse them into thinking that for it

19   to be an official act it has to have a writing or a hearing

20   when the Court's instructions cover this topic thoroughly.  We

21   went through all this yesterday.  It's unnecessary and worse

22   than being unnecessary, it's confusing, it's misleading to the

23   jury.

24        MR. McCARTHY:  They opened the door.  They have brought

25   up the examination process, which is why you allowed me to ask

1  Mr. Causey about it.  So you brought it up.  I mean, you made

2  it relevant.

3          MR. SMITH:  The last point I'll make, Your Honor, is

4  that I think it's highly relevant for the jury to understand

5  that -- and this is from the statute -- that whenever the

6  commissioner is authorized to grant any approval, authorization

7  or permission or to make any other order affecting any insurer,

8  insurance producer or other persons -- sorry, person or persons

9  subject to the provisions of Articles 1 through 64 of this

10  chapter, such an order shall not be effective unless it is made

11  in writing and signed by the commissioner as authority.  It

12  corroborates testimony that we've heard throughout that such

13  kind of informal transfer nobody understood to be something

14  like an administrative determination or the like.

15          MR. GULLOTTA:  Nobody has said that.  Nobody has said

16  that.  And that is a perfect example of how confusing and

17  misleading the statute is.  I don't think anybody in this

18  circle knows what he just read, what that means.  It has

19  nothing to do with the reassignment of people within the

20  division.

21          MR. WYATT:  I do.

22          THE COURT:  Well, since he would -- it was a sting

23  operation, there wasn't any chance that he was going to do the

24  transfer.  If he did -- if that statute were to be correct and

25  that -- I'd have to read through all these state statutes to

1    find out -- then we would have to find out if he signed it or

2    if he failed to sign it.  The transfer wouldn't be effective,

3    but the bribe still would be effective whether he signed the

4    thing or didn't sign the thing.

5          In other words, what you're saying is removal of some

6    of these people in the Department does require a signature and

7    he couldn't have done what he said he was doing correctly

8    without doing that.  Mr. Causey might have done it incorrectly.

9    I think there's a chance he could have done some things

10   incorrectly, but if that's true -- I think that confuses where

11   we are in this case.

12         I think it's dangerous to bring state law into the case

13   unless it is effective to settle an issue in this case.  And I

14   think the issues are before -- are properly before the jury

15   with regard to the evidence that's in the case.  So I'm going

16   to deny the motion.  Exceptions noted.

17         MR. SMITH:  Thank you, Your Honor.

18         MR. WYATT:  Wait.  Put the two statutes on the record.

19         THE COURT:  We're going -- we'll put them on the

20   record.  We'll put the statutes on the record.  And in this

21   case putting two of 64 before this jury, that the danger of

22   unfair prejudice outweighs any probative value that it has in

23   determining that the quid pro quo.  Since this was a sting

24   operation, this never would have -- you never would have known

25   where it was going to go and what this would have resulted in

1    had he made the change. He might have -- might have made the

2    change. He might have written a -- might have looked like the

3    Declaration of Independence and had a seal on it. I don't know

4    what it would look like. But it didn't happen because it was a

5    sting operation. So we don't know where it goes after that.

6    We don't know what happens after that.

7            MR. WYATT: Just so the record is clear, our initial

8    tender was of these two statutes. In the alternative, we would

9    tender all 62 statutes relating to --

10           THE COURT: Understood.

11           MR. GULLOTTA: 64.

12           THE COURT: 64. If the Fourth Circuit believes that we

13   need to see all those, then we'll be reading -- we'll set aside

14   a couple of months for Lindberg 3, so...

15           MR. WYATT: Can we confer for just a moment, Your

16   Honor?

17           THE COURT: You may.

18           (End of discussion at side bar.)

19           MR. McCARTHY: Proceed, Your Honor?

20           THE COURT: Yeah. Let's wait. Don't want to leave

21   these guys out.

22           MR. McCARTHY: I don't want to slow things down.

23           THE COURT: You may proceed.

24           MR. McCARTHY: Your Honor, ladies and gentlemen of the

25   jury, at this point the defense rests.

```
 1              THE COURT:  All right.  All right.  Members of the
 2    jury, if you will retire, we're going to talk a little bit.
 3    And is there any -- I guess I'd better find out first, is there
 4    going to be any rebuttal evidence from the government?
 5              MR. CAMERON:  No, Your Honor.
 6              THE COURT:  Okay.  So if you folks will go out for a
 7    minute, we have some things we have to do when the case is over
 8    with before the jury gets -- we go further with the case.  So
 9    we'll talk about that while you-all are out.  Okay.  Thank you.
10              (Jury out at 9:59 a.m.)
11              MR. DEVEREUX:  We probably should have done this in
12    front of the jury --
13              THE COURT:  I apologize.  I apologize.  You rest also.
14              MR. DEVEREUX:  That's correct.
15              THE COURT:  We'll take care of that.  I apologize,
16    Mr. Devereux.  I just assumed.
17              MR. WYATT:  Your Honor, on behalf of Mr. Lindberg, we
18    would renew our motions for judgment of acquittal.
19              THE COURT:  Okay.
20              MR. DEVEREUX:  And we would as well, Your Honor.
21              THE COURT:  In spite of the evidence the Court has
22    heard, the Court's decision on this remains the same, and the
23    motions will be denied.
24              So do you-all -- you-all are going to do something the
25    rest of the day?  Have you-all got buffets the rest of the day?
```

1  I told you -- if I had known it was going to be ten o'clock, I

2  might not have --

3  　　　　MR. WYATT:  I think we all could use the time to

4  present our closings in the morning.  We do have some comments

5  on the judge's jury -- the Court's jury instruction, and so we

6  would like to keep that schedule, if that's agreeable to the

7  Court.

8  　　　　THE COURT:  Yeah.  I'm not going to take away -- I've

9  told you -- and I know when you're preparing closing arguments

10  that -- well, maybe, maybe some really -- attorneys that are

11  really on top of it would have already gotten their closing

12  argument done.  Whatever time you gave me, I would use.  I'd

13  sit around and probably not work on it.  Probably plan on

14  working on it later tonight or something.  Always -- I work

15  better under pressure.

16  　　　　MR. DEVEREUX:  Just so Your Honor knows --

17  　　　　THE COURT:  I started practicing that in school, and it

18  seemed to work, so I kept it up.

19  　　　　MR. DEVEREUX:  Your Honor, just so the Court is aware,

20  we spent considerable time yesterday -- we really did

21  anticipate at least a day's worth of evidence, and we were very

22  mindful of the Court's time --

23  　　　　THE COURT:  No.  I don't feel like you-all planned this

24  and knew that it was going to be ten o'clock when we did that.

25  But I wouldn't take that -- but I do know that -- I do know how

1    these things work and what I would do.  So if I thought the

2    arguments were tomorrow, I certainly wouldn't want to make them

3    today.  It would be taking a lot of Tums between now and

4    getting up; a lot of heartburn.

5         MR. WYATT:  Your Honor, we do have some comments

6    relating to the Court's charge, and I believe the Court wanted

7    us to raise those.

8         THE COURT:  I do.  I do.  I do.  You-all -- I'm pretty

9    much sticking with what the Fourth Circuit said.  They talked

10   about the McDonnell case.  They were aware of it.  They went

11   all the way through it.  They gave a lot in there.  They talk

12   about 666.  They did a lot of stuff.

13        I'm going to let the jury sit back there for a minute.

14   I'm not going to send them out of here yet, because they're

15   going to be disappointed they came all the way in.  I'm going

16   to try to get them in at 8:30 in the morning so we can get

17   stuff done.

18        I know you-all have got an agreement.  I don't want the

19   government to go over 40 minutes.  You are entitled to whatever

20   they have on their side in terms of time.  So I cannot imagine

21   on a two-count Bill of Indictment that you'll be razzling

22   everybody for more than 40 minutes.

23        MR. CAMERON:  I like to talk, Judge.  I don't know.

24        THE COURT:  Well, I don't want you going way long.

25   I've got to get into these instructions and read these things.

1          MR. CAMERON:  Judge --

2          THE COURT:  It takes a long time to get through them.

3          MR. CAMERON:  I'm kidding, Judge.  We'll be --

4          THE COURT:  Good.  I prefer it to be 40 minutes.  I

5     just want to make it clear.  I always give the government the

6     same amount of time --

7          MR. WASHINGTON:  Judge --

8          THE COURT:  -- because you never know what these guys

9     are going to say over here.  Some of them come from Texas.

10          MR. WASHINGTON:  Yes.  And wear boots and stuff.

11     Judge, we would ask the Court to inquire as to both defendants

12     about their constitutional rights.

13          THE COURT:  Yeah, I need to do that.  I need to do

14     that, so...  Okay.  Let me get my -- I think I have a copy.

15          LAW CLERK:  I can print out a copy of the right to

16     testify copy.

17          THE COURT:  The right to testify copy, please.  I've

18     got to have a formal hearing on motion to continue a case named

19     Roger Roger.

20          MR. McCARTHY:  Not the rabbit.

21          THE COURT:  No.  Although he was hard as a rabbit to

22     find.  This was a bunch of Costa Rican cases where they call

23     and get people to donate money to them in Costa Rica,

24     essentially.  Somebody else has gone to trial, but he was in

25     the wind for a while.

1          MR. WYATT:  Your Honor, are we off the record?

2          THE COURT:  We can go off the record.  Sure.

3          (An off-the-record discussion was held.)

4          THE COURT:  Okay.  Let me start out with Mr. Lindberg's

5     advice of rights.  Mr. Lindberg --

6          MR. SMITH:  Should we go back on the record, Your

7     Honor?

8          THE COURT:  Let's go on the record.

9          And, Mr. Lindberg, if you would, please stand.

10    Mr. Lindberg, do you understand that you have a constitutional

11    right to testify in your own behalf at this trial?

12         DEFENDANT LINDBERG:  Yes, I do, Your Honor.

13         THE COURT:  You understand that it's you who retains

14    the ultimate authority to decide whether or not to testify?

15         DEFENDANT LINDBERG:  Yes, I understand that.

16         THE COURT:  Do you understand -- fully understand your

17    constitutional right to give your testimony in your own behalf?

18         DEFENDANT LINDBERG:  Yes, I do.

19         THE COURT:  You've discussed these rights with your

20    fine attorneys?

21         DEFENDANT LINDBERG:  I have.

22         THE COURT:  And you're satisfied that you understand

23    these rights?

24         DEFENDANT LINDBERG:  I am.

25         THE COURT:  Has anyone threatened you or made any

1    promise to you of any kind that has influenced your decision to

2    not to testify in this case?

3           DEFENDANT LINDBERG:  No.

4           THE COURT:  Okay.  Is your mind clear as to your

5    constitutional right that you alone have the authority to

6    determine whether you're going to testify, and if you decide

7    not to testify, there will be no later opportunity for you to

8    provide your own testimony to this jury?

9           DEFENDANT LINDBERG:  I understand.

10           THE COURT:  Thank you.

11           DEFENDANT LINDBERG:  You're welcome.

12           THE COURT:  Having listened to the defendant and

13    determined that he has freely, knowingly and voluntarily waived

14    his right to testify, the Court hereby accepts the waiver.

15           Mr. Gray.  I don't know when this frog is going to

16    jump out of my throat, but he's been in there for a while.

17            Mr. Gray, do you understand you have a constitutional

18    right not -- constitutional right to testify in your own behalf

19    in this case?

20           DEFENDANT GRAY:  Yes, Your Honor.

21           THE COURT:  You understand it is you who retains the

22    ultimate authority to decide whether or not to testify?

23           DEFENDANT GRAY:  Yes, Your Honor.

24           THE COURT:  You understand that it is a constitutional

25    right to give your testimony on your own behalf?

1          DEFENDANT GRAY:  I do, Your Honor.

2          THE COURT:  Have you discussed this right with your

3     fine attorneys, and are you satisfied you understand this

4     right?

5          DEFENDANT GRAY:  Yes, sir, I have.

6          THE COURT:  Has anyone threatened you or made any

7     promise to you of any kind that has influenced your decision

8     not to testify?

9          DEFENDANT GRAY:  No, Your Honor.

10         THE COURT:  Is your mind clear as to your

11    constitutional right that you alone have the authority to

12    determine whether or not you're going to testify, and if you

13    decide not to testify, there will be no later opportunity for

14    you to provide your own testimony to this jury?

15         DEFENDANT GRAY:  Yes, Your Honor, I do.

16         THE COURT:  All right.  Thank you.  Having listened to

17    the defendant and determined he has freely, knowingly and

18    voluntarily waived his right to testify, the Court hereby

19    accepts that waiver.

20         The instruction that the Court intends to give -- and

21    I'll certainly listen to anything on this -- is that each of

22    these defendants has elected not to testify in this case.  The

23    Court instructs you that each defendant has the constitutional

24    right not to take the stand and testify and not to speak at all

25    or offer any evidence.  The burden of proof being entirely upon

1    the government.  You must draw no adverse inferences of any

2    kind from the exercise of the privilege not to testify.  This

3    right is a fundamental one in America's criminal law and one

4    which cannot be disregarded by the jury at its pleasure.

5           So that's the instruction I'll give, unless you-all

6    convince me there's a better one to give in regard to that.

7           Okay.  I guess I'm going to bring the jury in and let

8    them go for the day.

9           MR. WYATT:  Your Honor, do you want our objections or

10   comments on the -- suggestions on the jury charge?

11          THE COURT:  Yeah.  Let's do that.

12          MR. SMITH:  May I do this while seated, Your Honor?

13          THE COURT:  You bet.  You certainly may.

14          MR. SMITH:  Thank you, Your Honor.  We have five

15   comments to the changes.  Again, just reserving for the record

16   the initial instructions that we had tendered at Docket No. 416

17   and the revisions that we proffered to the Court and filed on

18   the docket yesterday.  Without waiving any of those objections,

19   we had five comments on the instructions.

20          The first one is in the section on Definitions and

21   Explanations, which appears on my page 15.  And this is in

22   Count 2.  Your Honor had added a definition for business

23   transaction or series of transactions.  At one point in

24   illustrating that definition you refer to receiving the bribe;

25   i.e., Commissioner Causey.  We would ask that you add the word

1    "alleged" before bribe just to make it clear that, you know, no

2    bribe has been found by the Court.

3            THE COURT:  I'll do that.

4            MR. SMITH:  Within the same definition, Your Honor has

5    provided information on valuing the $5,000 for the jury.  I

6    agree it's a correct statement of the law to say that the jury

7    may rely on the bribe as evidence, but ultimately it's the

8    subject matter of the bribe that's at issue.  For balance, we

9    would ask that the Court include an instruction that the jury

10   may take into account alternative means of valuing the bribe.

11           I'll note that the language from the Fourth Circuit

12   that was one-sided was in response to an argument by us on

13   appeal that essentially that element was toothless because the

14   prosecution could rely on the value of the bribe.  And they

15   were responding and saying, yes, that's true, but it's only

16   evidence.  So I don't think the Fourth Circuit fully explored

17   the alternative ways of valuing.

18           And so, for example, this instruction that we suggested

19   on adding cost to the government as a potential source of

20   valuing the bribe I think is relevant and appropriate to

21   neutrally describe the jury's task.

22           THE COURT:  I'm not sure that -- anyway, let me hear

23   from the government.

24           MR. GULLOTTA:  We object to that, just as we did

25   yesterday, Your Honor.  And we think the Court's instruction is

1 sufficient and compliant with the Fourth Circuit's ruling in

2 this matter, and I don't think adding in other alternative

3 theories or methods of calculating the $5,000 is necessary.

4 And I think what you have here is sufficient and also

5 consistent with the standard instructions in a 666 case.

6         THE COURT:  Ms. Lewis, give me a copy of that, my copy

7 of my instruction on that.  I'm not going to put in a financial

8 analysis on how they can do it, but I'll say I'm considering

9 some phrase --

10         MR. SMITH:  What we had suggested before, Your Honor,

11 is that one way to determine its value is to consider what it

12 would cost the government to perform the subject matter of the

13 alleged bribe.

14         THE COURT:  The thing about putting it at the end

15 after -- find the value of the business transaction or series

16 of transactions shall exceed $5,000 and can consider all of the

17 evidence in the case in arriving at the value of the

18 transaction.

19         MR. SMITH:  As a potential addendum, Your Honor,

20 including the cost to the government of performing the subject

21 matter of the alleged bribe.

22         THE COURT:  I'm not going to add anything to it.

23 You-all can argue that.

24         MR. SMITH:  Okay.  Thank you, Your Honor.

25         THE COURT:  I mean, he asked the question to her as to

1   what it would take.  I mean, I'm sure there's cost associated

2   with the time, particularly when the transfer takes place.  He

3   has to go down and sign a document somewhere or something.  But

4   the -- but I don't know what it is, and I don't know that there

5   was any evidence on that.  But you can argue that, because

6   that's been -- that was a question that was asked of this

7   particular person.  And you can argue that.  They can argue the

8   cost shows what it is, which is the financial value to the --

9   of doing this sort of thing.

10          So the jury is going to have to decide it.  Both sides

11  are going to argue what it's worth, and the jury will make that

12  decision.  You-all can argue what you have.  They'll argue what

13  they have, and the jury will make a call.

14          But I'll add that -- add something on there that they

15  can use any -- they can use the value of the bribe that was

16  offered or any other evidence in the case that they think is

17  relevant with the bribe.  So I'll put something like that in.

18          MR. SMITH:  The third of five points to the judge's

19  final proposed instructions relates to the definition of

20  corruptly in the same section, Your Honor.  In the last

21  sentence the Court says, "one has the intent to corrupt an

22  official only if he makes a payment or promise with the intent

23  to engage in a specific quid pro quo, this for that, with that

24  official."  And the addition we would suggest is "and only if

25  he also knew at the time that this conduct was unlawful," which

1    is consistent with the earlier aspect of this definition.  And

2    it's just distinguishing between the required mens rea and the

3    actus reus in this case.

4         MR. GULLOTTA:  Again, Your Honor, this is redundant and

5    unnecessary.  The first line of this instruction says "an act

6    is done corruptly if it was done with the knowledge that the

7    conduct was unlawful and with the intent to engage in some

8    specific quid pro quo."  It doesn't need to be repeated.

9         THE COURT:  Yeah.  I was satisfied with that

10   instruction when I looked at it, so I'm going to stick with the

11   instruction.  Exceptions noted.  It is in there.  It's in that

12   instruction, the first part of it.  It doesn't even start -- it

13   starts with he has to know conduct is unlawful -- both sides

14   have things they can argue about that.  The jury will decide.

15        MR. SMITH:  The fourth point, which is an issue that I

16   understand you already ruled on, but just to make it clear for

17   purposes of preservation, we would ask that the Court instruct

18   the jury on Count 1 as to the substantive defense that includes

19   the element of corrupt intent.

20        THE COURT:  That's not in the instruction -- that's not

21   in the statute itself.  I think that it's almost as if you have

22   a specific intent that corruptly is just sort of an extra word

23   there.  It's like it's almost the same thing.  I don't see that

24   there's much instruction with regard to it.  It's just who is

25   being -- essentially who is being -- who is being -- taking

1    part of that.  If it's a public official, you're corrupting the

2    official, so...

3         I understand that.  And the Fourth Circuit has

4    essentially, I think, led the way on what ought to be in there,

5    so...

6         MR. SMITH:  Thank you.

7         THE COURT:  They had a good, full ride there.  They had

8    the benefit of your input and national defense folks.  And I'm

9    sure that somewhere along the line the ACLU came in and helped

10   out a little bit.  So you've got -- the Court had a lot of

11   information and wrote a rather long opinion.  So I think that

12   sort of puts the Fourth Circuit where it is, at least as of

13   today.

14        MR. SMITH:  Thank you, Your Honor.  The final comment

15   we had on the instructions was in the official act definition.

16   The specific sentence that we would ask the Court to excise,

17   because there's no evidence of it, is "an official act also

18   includes a public official exerting pressure on another

19   official to perform an official act or providing advice to

20   another official knowing or intending that such advice will

21   form the basis for an official act by another official."

22        I don't think we've heard any evidence in this case of

23   any pressure that Mr. Causey put on another official, nor do I

24   think we've heard of any evidence of advice that he provided

25   that related to an official act.

```
1         THE COURT:  The evidence with regard to that was -- is
2    the same evidence in this case that's been put in here as was
3    in Mr. Lindberg 1's case.  It went up to the court.  The court
4    looked at that instruction and said the Court correctly defined
5    it.  Therefore, the Court -- like I said before, I'm staying
6    with the words that the Fourth Circuit has specifically said.
7         Let me see if I can find exactly what they said.  In
8    fact, I may put this on the wall.  Just cut this out, put it up
9    in a frame.  Let's see here.  Although the district court
10   properly defined the term official act, according to the
11   directive of McDonnell.  Now, what it says after that is not as
12   laudatory.
13        MR. SMITH:  And, Your Honor, I just note for the record
14   I'm unaware that we made that objection previously to that
15   portion of the instructions, so it wasn't particularly relevant
16   to the Fourth Circuit's decision.  So I'm just noting the
17   objection now because I don't think that there was any evidence
18   to sustain that, and so it would be needlessly confusing to the
19   jury to read it.  Thank you.
20        THE COURT:  I don't think it's need -- I think the
21   evidence is what it is.  And I think they're going to stick
22   with the part of the specific act that they say was violated
23   and not go off in the weeds.  I think that's what they're going
24   to do.
25        I'll watch that -- be careful what you do on -- I know
```

 1    there's some argument that there was some misstatements of law

 2    in the opening statement.  Be careful.  This is the closing in

 3    the case now.  Do not misstate the law.  If you want to argue

 4    the law, you get to argue that to the Fourth Circuit that my

 5    instructions were terrible.  But I'm going to give the

 6    instructions, and any argument that pulls away from those

 7    instructions on a legal argument is going to probably be met

 8    with some stoppage by the Court.

 9          So just be -- you can argue what it shows, and you can

10    argue the -- Mr. Devereux is going to be arguing that it's not

11    a lawsuit in court.  As far as I know, that's where they are.

12    And so you're going to argue those kind of things, and I think

13    Mr. Lindberg is going to be arguing that it wasn't going to

14    cost any money.  And at least Ms. Walker doesn't think it costs

15    any money to move something over or move one of them over.  I

16    mean, you're going to be able to argue all that.

17          For instance, the act, the quid has to be illegal or

18    the quo has to be illegal.  You won't use that term.  But in

19    arguing that the campaign contribution has to be illegal in

20    order for it to be corrupt or the thing sought has to be

21    illegal in order for it to be corrupt is not a correct

22    statement of the law.  You're taking two separate legal things.

23    And when they're put together -- and it can't be -- I mean, the

24    courts have been real clear on the specific -- it has to be for

25    a specific quo.  It has to be a specific thing you're asking

1    for.

2          If you give a bunch of money to somebody and say, do a

3    good job, it's okay.  It's not illegal.  It's not -- maybe it

4    ought to be.  It will never be made illegal because Congress is

5    living large on their investments.  To be able to say -- to be

6    able to -- after you do an act, good boy, here, $130,000,

7    that's not illegal.  But if you said, I'll give you $130,000 to

8    call Michigan and make that call for us, that's illegal.  It's

9    the quid pro quo.  And that action is what makes these other

10   things illegal.

11         I think, you know, you see all these folks retiring.

12   They got all these big campaign war chests.  Are they going to

13   send those to the other candidates?  No.  They're going to pay

14   taxes on them and take the rest of it home.  It's a great

15   thing.  That's why nobody ever complains about a Congressional

16   salary because -- somebody ought to do a study about what their

17   net worth is when they go in and after 20 years what their net

18   worth is.  They'll be doing a better job than you.

19         Now, we do file financial reports, and one went out

20   this week.  Everything we do we have to file.

21         MR. McCARTHY:  Judge, I just had one quick note.  When

22   you were doing the Rule 29, the jurors were behind the door in

23   the hallway.  I just wanted to make sure they couldn't hear

24   you.  I don't know logistics back there.

25         THE COURT:  You weren't able to hear --

1          COURTROOM DEPUTY:  They could not hear.

2          THE COURT:  You were back there; correct?

3          COURTROOM DEPUTY:  Correct.

4          THE COURT:  You didn't hear?

5          COURTROOM DEPUTY:  No, I did not hear anything.

6          THE COURT:  Okay.

7          MR. McCARTHY:  You have a lot of influence, so I want

8   to make sure they don't hear your Rule 29 motion.

9          THE COURT:  Yeah.  That would have been a problem,

10  so...

11         MR. CAMERON:  Your Honor, if I could note one thing.

12  During the opening when we believed that the law was

13  misstated -- you know, we've tried this case in a way that has

14  been very cooperative and collaborative with counsel, and I

15  think that's why we were disinclined to object.  I just did

16  want to note for the Court and opposing counsel if the law was

17  misstated again like it was in opening, we will object.

18         THE COURT:  Well, I think you should.  But don't do it

19  on a -- just because it's a small thing.

20         MR. CAMERON:  No.  No.  Exactly.

21         THE COURT:  I'll jump in if I think that they're --

22  normally I'll sit there and go over my computer while you-all

23  argue because it's really not -- but I think I'm going to

24  listen to you-all's arguments today.  If there's a problem,

25  object, but not on little things.

          1          MR. CAMERON:  Right.  No.  A significant misstatement

          2     of the law.

          3          THE COURT:  Yeah.  Because, I mean, sometimes you want

          4     to object just because they're making ground on you.  That's

          5     sort of the stuck pig hollers kind of thing.  So you don't want

          6     to do that --

          7          MR. CAMERON:  We have no intention of doing that, Your

          8     Honor.

          9          THE COURT:  -- that kind of stuff.

         10          MR. WYATT:  Your Honor, there is still the redaction of

         11     the indictment.

         12          THE COURT:  Yeah.  Let's talk about that a little bit.

         13     What do you-all need to have --

         14          MR. WYATT:  It still lists Mr. Palermo as a defendant.

         15     Still has references to things that are completely

         16     inadmissible, like paragraphs 27 and 29.

         17          Mr. Smith, do you want to --

         18          THE COURT:  Tell you what we're going to do.  Let's

         19     send the jury home.  And then you-all go through and show --

         20     and talk to the government about it.  And I'm inclined to leave

         21     stuff out that's -- like Mr. Palermo.  I don't think we ought

         22     to have him as a defendant in the case.  It's just that

         23     Mr. Palermo did something, I think that in terms of it, I think

         24     we can -- that's part of what the evidence is in the case.  So

         25     the stuff -- Mr. Palermo is not out of it only as a defendant,

 1   because everybody is going to wonder where he is.  But if

 2   there's something in there, talk to them.  And then if there's

 3   a dispute about what ought to come out, I'll decide what we

 4   redact.  I want to make sure it's -- it goes back correctly.

 5   But I do send the -- the normal practice is send the indictment

 6   back so they can see.

 7        MR. SMITH:  Perhaps the most efficient path would be

 8   for us to highlight proposed redactions that we could send to

 9   you-all.

10        MR. CAMERON:  Yes.

11        MR. SMITH:  There may be some agreement on some and

12   just take up the Court's time on those few issues --

13        THE COURT:  It may not look exactly like those other

14   documents that I did, but if there's something in there that

15   shouldn't be in there or that might, in light of the evidence

16   in the case, come out, I'll take it out.

17        MR. SMITH:  Thank you, Your Honor.

18        THE COURT:  Like Mr. Palermo as the defendant needs to

19   come out as the defendant because the jury is going to be

20   sitting there and saying where is Palermo, because they heard

21   him on there a lot.

22        Okay.  Anything else before I bring the jury in and

23   send them home for the day?

24        MR. WASHINGTON:  I don't know that Mr. Gray rested on

25   the record.

```
 1          THE COURT:  Yeah.  Let's bring them in and let him
 2    rest.  And then we'll take care of -- Ms. Lewis is looking at
 3    me.  It's not a good sign.
 4          We'll send you a verdict form, but essentially it's
 5    going to be Count 2 and then Count 1 because of the way I
 6    instructed.  Count 2 will be first, and I'll tell them that
 7    Count 2 is going to be in there first.  And I don't think
 8    they'll be confused between 1 and 2.  If we had a big
 9    indictment and moved a lot around -- if they're confused
10    between 1 and 2, that might be a good day for the defense.  If
11    they're that confused by those or where those are, they may not
12    understand any of this evidence, so...
13          COURTROOM DEPUTY:  Are you ready for the jury?
14          THE COURT:  Yes, ma'am.
15          (Jury in at 10:36 a.m.)
16          THE COURT:  Okay.  All right.  Members -- Mr. Gray -- I
17    neglected Mr. Gray when we were in there, and I have done that
18    several times, and I apologize.
19          Mr. Devereux.
20          MR. DEVEREUX:  Thank you, Your Honor.  Your Honor,
21    Mr. Gray also rests.
22          THE COURT:  All right.  Very good.  And so there's no
23    rebuttal from the government.  So we're now -- we go to closing
24    arguments and instruction to the jury.  But what we're going to
25    do is let you go home today and get ready for tomorrow and try
```

1    to use your time well tomorrow.  Can you-all be here at 8:30

2    tomorrow instead of nine o'clock?  I know that's a lot to ask,

3    but you're going to have to listen to some arguments.  It's not

4    evidence.  You're going to have to -- I'll tell you again

5    tomorrow the lawyers get to talk to you and tell you what they

6    think the evidence should show you.  None of that is going to

7    be evidence, but you're going to have to listen to it, and you

8    need to consider it.  Okay?  So you'll do that for a while

9    tomorrow.

10          And then you're going to have to listen to me do the

11   jury instructions.  And they're important.  I'm going to be

12   reading those.  That's not going to be very exciting.  So all

13   that's got to be done.  And then you're going to go back and

14   deliberate in the case.  So I'd like to be able to get that

15   compacted in and give you-all plenty of time to deliberate in

16   case you-all want to reach a verdict tomorrow.  You don't have

17   to.  It's up to you as to how long you go, but you can go

18   short, you can go long.  It's totally up to the jury.  But I

19   want to give you enough room to move, and that would do it.

20          So I know I see some faces on here that have no problem

21   with 8:30, but tell me about 8:30.  Can you-all make 8:30?

22   Okay.  Great.  Everybody?  Thank you.

23          All right.  So we'll be here at 8:30, and we will start

24   with the arguments of counsel.  The government will go first.

25   They get to go first and last because they have the burden of

1    proof in the case.  It's their burden.  The defense will go in

2    the middle.  But everybody can get the same amount of time.

3    I've given them some time to do it, and I think I've given them

4    a lot of time to do this.  They don't have to use it all, but

5    they can argue to you for a particular period of time.  And

6    then it will be over.  And then I'll give you the instructions,

7    and it will be for you to make your determination on what the

8    evidence does show in the case.  Okay?

9           So let's -- I know we're using -- we're not using part

10   of today, but I think -- there are reasons the Court has for

11   that.  And we'll be here working a little bit after you're

12   gone, so it doesn't mean we're going to be out funning around

13   out there.  We're going to be working while you-all are gone.

14          So take care of yourselves.  Be careful -- this weather

15   is not really good, and so you've got to be careful driving.  I

16   know it was probably hard coming in this morning based on what

17   I was seeing on television that some of the roads were getting

18   a lot of water.  So be careful.  I think we're going to get

19   rain tomorrow, so be careful coming in.  And we'll be watching

20   for you.  Try to get here at 8:30, but if something happens,

21   we'll wait on you.  We're not going to do anything.  So I want

22   you to get here safe.  That's what we're worried about.  Get

23   here safe.  We'll see you tomorrow morning.  Okay?  All right,

24   folks.  Thank you.

25          Oh, don't talk about the case anymore.  And now you've

```
 1    heard all the evidence, they're really going to want to know
 2    what you know about it at home.  Tell them one more day or two
 3    more days, whatever it's going to be, and you'll let them know.
 4    You're almost done.  Okay.  Thank you.
 5              (Jury out at 10:40 a.m.)
 6              THE COURT:  Okay.  So let's let the jury get out of
 7    here before everybody takes off or whatever buffet is waiting
 8    across the street.
 9              MR. WYATT:  Today it's the mystery buffet, Your Honor.
10              THE COURT:  Mystery buffet.  I want to hear about all
11    the delicious food everybody over here is getting while we go
12    begging over here.
13              So we'll let the jury get out.  And then if you-all
14    will send -- talk about this.  I know they want to send you
15    that, but after they do it, talk to each other about it.  I
16    mean, e-mails are fine --
17              MR. CAMERON:  Yes, Judge.
18              THE COURT:  -- but it's good to talk to each other
19    about it.
20              MR. WASHINGTON:  We'll try to work out as much as we
21    possibly can.
22              THE COURT:  Okay.
23              MR. WASHINGTON:  Do you have the one that went back
24    last time?
25              MR. WYATT:  It was redacted last time.
```

1          THE COURT:  Yeah.  You got one that was redacted last

2    time.  Apparently there was no appellate issue on it, at least

3    that the Fourth Circuit wanted to speak on.

4          MR. WYATT:  We also had a third defendant.

5          THE COURT:  That's true.

6          MR. CAMERON:  Do you have the final one that went back?

7          LAW CLERK:  The indictment.

8          THE COURT:  I'm going to take Palermo out of it.  I'm

9    not just going to do the same thing I did last time.  I just

10   want to see the one that got redacted.

11         MR. WYATT:  Your Honor, I also have Robin Hayes in

12   there who needs to be taken out.

13         MR. GULLOTTA:  And just for the record, we're talking

14   about removing those names from the caption.

15         THE COURT:  Right.  Right.  If it's relevant to what's

16   in the rest of the indictment, I'll leave it in.  We've heard

17   the evidence.  We've heard it twice, so...

18         MR. SMITH:  I think the challenge there is the standard

19   format that the United States Government uses is to all caps

20   defendant, so it doesn't take much to figure out that Mr. Hayes

21   and Mr. Palermo were defendants because their names are

22   included in all caps.

23         THE COURT:  Maybe we can redo the first page.

24         MR. CAMERON:  There's also all caps on other -- like

25   the commissioner's name is in all caps.  NCDOI is in all caps.

1    I think in this particular case, while I agree with that
2    statement generally it might make sense, but here, because
3    there are other words that are not defendants that are in all
4    caps, I don't think it's quite as obvious that they're
5    defendants.
6            THE COURT:  Well, the places they're mainly in there is
7    in the -- if we could make sure that it doesn't look like the
8    caption has been changed.
9            MR. CAMERON:  I see.  Yeah.
10           THE COURT:  So that the caption appears for those two.
11   Then the rest of it can be persons in there, unless there are
12   persons that are not capitalized.
13           MR. SMITH:  The only person not charged that's
14   capitalized is the commissioner.  So I think that the jury is
15   going to be able to infer when they see certain names in a list
16   but not others that they're defendants.  But we'll try and sort
17   it out with the government.
18           THE COURT:  Yeah.  See if you can figure out a way to
19   do it that makes sense.
20           So is the jury still in the building?
21           COURT SECURITY OFFICER:  One more.
22           THE COURT:  One more to go?
23           COURT SECURITY OFFICER:  Yes, sir.
24           THE COURT:  Okay.  The jury is out of the building, so
25   everyone is released for recess.  Now, if you-all want to stay

1  in here and do this work, then we'll leave the courtroom open

2  for you-all to do that.  I'm not worried about anything

3  happening, so...

4          COURTROOM DEPUTY:  I'll be here.

5          THE COURT:  Okay.  So we'll leave you-all in here,

6  anybody that wants to be in here and do this and get this

7  redacting done or anything else that needs to be done.

8          And I've got to get those two documents into the record

9  in a way that it doesn't go to the jury, but I'm going to put

10  it in the record for appeal.

11         Looks to me like everybody is going to lunch.  That's

12  okay.  Those big buffets that Mr. Wyatt has over there.

13         MR. WYATT:  I may have to order some Luella's barbecue.

14         THE COURT:  Okay.  We're in recess.

15         (Proceedings adjourned at 10:48 a.m.)

16

17

18

19

20

21

22

23

24

25

1                  UNITED STATES DISTRICT COURT

2              WESTERN DISTRICT OF NORTH CAROLINA

3                  CERTIFICATE OF REPORTER

4

5

6          I, Rebecca S. Maxcy, Federal Official Realtime Court

7     Reporter, in and for the United States District Court for the

8     Western District of North Carolina, do hereby certify that

9     pursuant to Section 753, Title 28, United States Code, that the

10    foregoing is a true and correct transcript of the

11    stenographically reported proceedings held in the

12    above-entitled matter and that the transcript page format is in

13    conformance with the regulations of the Judicial Conference of

14    the United States.

15

16          Dated this 17th day of June, 2024.

17

18                        /s/ Rebecca S. Maxcy_____
19                        REBECCA S. MAXCY, RMR, CRR
                          Official Court Reporter
20

21

22

23

24

25